**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------- X

APPROVED OIL CO. OF BROOKLYN, INC.,

                          *Plaintiff*,

        -against-

SPRAGUE HP HOLDINGS LLC,
SPRAGUE RESOURCES GP LLC,
SPRAGUE RESOURCES LP, SPRAGUE
OPERATING RESOURCES LLC, and
149TH LLC

                        *Defendant*.

------------------------------------------------------- X

Civil Action No.

**Complaint**

**Jury Trial Demanded**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

JURISDICTION AND VENUE ........................................................................................... 5

PARTIES ............................................................................................................................. 5

FACTS ................................................................................................................................. 7

    I.    THE LIQUID FUEL INDUSTRY ........................................................................... 7
        A.    Large Scale Liquid Fuel Distributors .................................................. 7
        B.    Liquid Fuel Products ........................................................................... 8
        C.    Deepwater Barges and Terminals ..................................................... 10
    II.    APPROVED AS A DISRUPTIVE COMPETITOR ................................................ 12
    III.    SPRAGUE CONSOLIDATES ITS CONTROL OF THE NEW YORK CITY DEEPWATER TERMINALS 15
    IV.    OTHER RECENT ACTS IN FURTHERANCE OF SPRAGUE'S PLAN TO EXCLUDE APPROVED FROM SALES TO LARGE CUSTOMERS, INCLUDING THE CITY OF NEW YORK ............................. 17
        A.    Tank 9011 Inspection ........................................................................ 17
        B.    Blocking Deliveries ........................................................................... 18
        C.    Interference with Independent Truckers ........................................... 19
    V.    SPRAGUE REFUSES TO RENEW APPROVED'S LEASE AT THE BUCKEYE TERMINAL ............ 21
    VI.    THE 2023 ACQUISITION AND ITS ANTICOMPETITIVE EFFECTS ................. 23
        A.    The Relevant Product Market ........................................................... 23
        B.    The Relevant Geographic Market ..................................................... 24
        C.    Market Participants and Market Structure ........................................ 26
        D.    Barriers to Entry and Expansion ...................................................... 28
        E.    Anticompetitive Effects ..................................................................... 30
        i.    Effects on Liquid Fuel Distributors .................................................. 30
        ii.    Effects on Consumers of Liquid Fuel ............................................... 31
        1.    No. 2 and No. 4 Heating Oil ............................................................. 31
        2.    Diesel Fuel ........................................................................................ 33

CLAIMS FOR RELIEF ..................................................................................................... 36

COUNT I............................................................................................................................ 36

COUNT II........................................................................................................................... 37

PRAYER FOR RELIEF ..................................................................................................... 39

DEMAND FOR JURY TRIAL .......................................................................................... 40

## INTRODUCTION

1.      Sprague HP Holdings LLC, Sprague Resources GP LLC, Sprague Resources LP, and Sprague Operating Resources LLC, 149th LLC (collectively, "Sprague" or "Defendants") sell liquid fuel oil products, including heating oil and diesel fuel (collectively, "Liquid Fuel") nationwide.  Sprague is the largest distributor of Liquid Fuel in New York City.  Already the owner of the largest deepwater Liquid Fuel terminal in New York City, Sprague unlawfully acquired the second largest and only other deepwater terminal in New York City for the purpose and with the intent of obtaining illegal monopoly power and eliminating Plaintiff Approved Oil Co. of Brooklyn ("Approved" or "Plaintiff") as its principal competitor in the distribution of Liquid Fuel in New York City.

2.      New York City has an enormous need for Liquid Fuel, principally to provide heat in the winter and hot water all year round to its millions of residents, hospitals, businesses, schools and other facilities, as well as to power vehicles and construction equipment, many of which rely on diesel, biodiesel or renewable diesel fuel.  Most Liquid Fuel products sold in New York City are produced at a distance from the city and must pass through a very limited number of docks and terminals to meet the market's needs in an economical and logistically feasible way.  Sprague now owns the two largest storage terminals in New York City.  Sprague operates out of the so-called "Sprague Terminal," which provides approximately 52% of the storage capacity for Liquid Fuel in New York City.  The so-called "Buckeye Terminal," which Sprague recently illegally acquired, provides approximately 31% of the storage capacity for New York City.  These are the only terminals capable of handling the very large quantities of Liquid Fuel needed by New York City consumers.  Through its unlawful actions, Sprague seeks to eliminate its principal competitor by seizing control of the "choke point" of this distribution network and

closing down the Buckeye Terminal, thereby leaving its Sprague Terminal as the only remaining deepwater terminal in New York City. Through this scheme, Sprague has gained control over approximately 83% of the storage capacity for Liquid Fuel products in New York City ("Liquid Fuel Terminal Storage") and has illegally acquired monopoly power.

3.     Approved is both a wholesale and retail distributor of Liquid Fuel, among other energy-related products, and is Sprague's principal competitor in New York City. It sells Liquid Fuel to large institutional and commercial customers, to retail distributors who sell that fuel on to residential and smaller commercial customers, and directly to smaller retail customers. In order to supply that Liquid Fuel, Approved currently leases tank space out of the Buckeye Terminal, from which it distributes the vast majority of the Liquid Fuel it sells in New York City. In order to interfere with Approved's ability to compete with it, Sprague acquired that Buckeye Terminal in March of 2023, and then, in March of 2024, informed Approved that it would not only terminate Approved's ability to use the Buckeye Terminal at the conclusion of its lease in December 2025, but also eliminate that terminal altogether from the market.

4.     With this acquisition, Sprague now entirely controls deepwater terminal access in New York City and owns approximately 83% of all Liquid Fuel Terminal Storage in New York City. Access to a deepwater terminal is critical to any distributor of Liquid Fuel that wishes to compete with Sprague in New York City. This is because logistical barriers and transportation costs from points outside of New York City make it a practical impossibility to deliver meaningful quantities of Liquid Fuel without access to deepwater transportation terminals in New York City. Additionally, because of the costs and length of time it takes to convert to energy sources other than Liquid Fuel to provide heat and hot water, the dominant position that

Sprague has acquired in New York City is protected against competition from other energy sources such as electricity or natural gas.

5.      Defendants' motivation for this conduct is clear.  In 2021, Sprague tried to acquire Approved to eliminate its key competitor.  However, Sprague's efforts failed, and in 2022 Approved entered the bidding for a lucrative contract to supply certain Liquid Fuel to municipal agencies of the City of New York.  This contract had previously been awarded to Sprague, because no other competitors had the storage capacity to supply this quantity of fuel to such a large customer.  When Approved bid on that contract, Sprague responded to this threat by escalating its anticompetitive scheme to eliminate Approved as a competitor.  Having failed to acquire Approved, Sprague instead acquired the terminal through which Approved was supplying the vast majority of its Liquid Fuel and announced it would close that terminal at the end of 2025.  And, in the interim, further evidencing its intent, Sprague also used its position to interfere with Approved's ability to fulfill its existing contracts, including: (i) demanding unnecessary tank inspections at the Buckeye Terminal to impede Approved's ability to store renewable diesel; (ii) attempting to block trucks from picking up deliveries from Approved at the Buckeye Terminal; and (iii) threatening independent truckers who agreed to do business with Approved.

6.      Moreover, by eliminating Approved's future ability to store large quantities of Liquid Fuel, Sprague has restrained Approved's ability to bid on or fulfill future contracts. Large customers, like the municipal agencies of the City of New York, as well as hospitals, universities and sizable housing complexes, know that if Approved does not have access to the storage capacity of the Buckeye Terminal or its equivalent, Approved cannot guarantee supply of the Liquid Fuel they need.  As a result, those customers are already refusing to entertain bids

from Approved and will continue to refuse bids from Approved unless it has that storage capacity. Indeed, City of New York agencies require bidders to have access to storage capacity, which Approved will not have if Sprague's anticompetitive conduct goes unchecked. In addition, retail distributors who purchase wholesale fuel from Approved and provide it to smaller commercial and residential customers have also begun refusing to enter into contracts with Approved because it is clear that without the Buckeye Terminal, it will not be able to supply Liquid Fuel on a wholesale basis.

7.     This conduct not only harms Approved, but also competition more generally. Having eliminated Approved as the only other supplier who can bid for certain large contracts, and having eliminated Approved's ability to supply wholesale Liquid Fuel to retail distributors in the future, Sprague is now free to charge higher prices to both. If and when Approved loses access to the Buckeye Terminal altogether, Sprague's ability to charge higher prices will only increase. In short, Defendants are engaging in the type of conduct most condemned under antitrust law. Instead of competing on the merits, Defendants have schemed to eliminate illegally their largest and closest competitor's terminal storage capacity in order to insulate their business from competition. In short, they are attempting to acquire monopoly power over the New York City Liquid Fuel Terminal Storage market. This conduct has and will continue to inflict substantial anticompetitive effects with no offsetting procompetitive benefits.

8.     These tactics violate both Section 7 of the Clayton Act and Section 2 of the Sherman Act. Plaintiff is bringing this action to prevent Sprague from restraining trade and establishing an illegal monopoly in the New York City Liquid Fuel Terminal Storage market to the detriment not only of Approved, but also to the City of New York and the many thousands of consumers who depend on Liquid Fuel for heat and hot water and to power vehicles and

construction equipment.  In addition to seeking an injunction to prevent the planned shutdown of the Buckeye Terminal and the termination of Approved's lease, and ultimately an order requiring Defendants to divest the Buckeye Terminal, Plaintiff also seeks recovery of treble damages and attorneys' fees and expenses in compensation for the damages it has already suffered and will continue to suffer as a result of Defendants' unlawful acquisition and anticompetitive conduct.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26.

10.      Defendants' violations occurred in and directly affected United States commerce. These violations give rise to Plaintiff's claims in this action under the Clayton Act and the Sherman Act.

11.      Venue is proper in this District under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, 26, and 28 U.S.C. § 1391(b), because during all times relevant to this action, Defendants resided, transacted business, maintained offices, maintained agents, or were found in this District, and because a substantial part of the events giving rise to Plaintiff's claims, and a substantial portion of the affected interstate trade and commerce as described below, occurred, and were carried out, in this District.  Defendants also inserted products or services in the stream of commerce that were intended to and did reach this District.

## PARTIES

12.      **Plaintiff Approved Oil Co. of Brooklyn, Inc.** is a New York corporation with its principal place of business at 6717 4th Avenue, Brooklyn, New York 11220.  Founded in 1932, Plaintiff provides Liquid Fuel and energy-related services to wholesale and retail customers, including large institutional customers, in the Northeastern United States.

13.     **Defendant Sprague HP Holdings LLC** is a Delaware limited liability company with its principal place of business at 1185 Avenue of the Americas, New York, NY 10036. Sprague HP Holdings LLC wholly owns Sprague Resources GP LLC and Sprague Resources LP.

14.     **Defendant Sprague Resources GP LLC** is a Delaware limited liability company with its principal place of business at 185 International Drive, Portsmouth, NH 03801. Sprague Resources GP LLC is owned by Sprague HP Holdings LLC and manages Sprague Resources LP.

15.     **Defendant Sprague Resources LP** is a Delaware limited partnership with a principal place of business at 185 International Drive, Portsmouth, New Hampshire 03801. Sprague Resources LP is owned by Sprague HP Holdings LLC. Sprague Resources LP owns Sprague Operating Resources LLC.

16.     **Defendant Sprague Operating Resources LLC** is a Delaware limited liability company with its principal place of business at 185 International Drive, Portsmouth, New Hampshire 03801. Sprague Operating Resources LLC is a wholly owned subsidiary of Sprague Resources LP.

17.     Defendants Sprague HP Holdings LLC, Sprague Resources GP LLC, Sprague Resources LP, and Sprague Operating Resources LLC are hereinafter collectively referred to as "Sprague." Sprague is a major distributor of refined petroleum products, including heating oil, diesel, gasoline, and kerosene. Sprague also provides natural gas supply. Sprague is the largest distributor of Liquid Fuel in the New York City market. Sprague's customers include independent retail distributors, commercial and industrial end-users, government entities and residential end-users.

18.    **Defendant 149th LLC** is a Delaware limited liability company with its principal place of business at 185 International Drive, Portsmouth, New Hampshire 03801.  Defendant 149th LLC is a wholly-owned subsidiary of Sprague Resources LP.

## FACTS

### I.    The Liquid Fuel Industry

#### A.    *Large Liquid Fuel Distributors*

19.    Tens of thousands of buildings in New York City, including individual residences, large apartment complexes, hospitals, universities, offices and commercial facilities are dependent on Liquid Fuel to provide heat and hot water.  The balance use natural gas, electricity and other sources.  As discussed below in greater detail, these energy sources are not close substitutes for Liquid Fuel because switching from one energy source to another involves expensive equipment conversion, infrastructure construction and time for implementation.  Therefore, there are substantial barriers that prevent consumers of Liquid Fuel products from shifting their purchases to other energy sources.

20.    Large distributors play a critical role in the distribution of Liquid Fuels.  They buy Liquid Fuel from producers, transport that fuel to locations where it is used, and store in their inventory millions of gallons of Liquid Fuel products.  They then sell that inventory to large commercial customers as well as retail distributors who, in turn, provide fuel to smaller consumer accounts.  Large distributors also provide fuel to smaller consumers directly.

21.    Large Liquid Fuel distributors in New York City procure Liquid Fuel products that are produced and refined at places far away from the city.  Most Liquid Fuel products are then transported to New Jersey, where they are stored before being transported to the distributors' Liquid Fuel Terminal Storage facilities in New York City from which they are

delivered to customers.  Therefore, large Liquid Fuel distributors need Liquid Fuel Terminal

Storage in New York City to receive and store vast quantities of Liquid Fuel products.

Substantial Liquid Fuel Terminal Storage capacity is even more critical in emergency situations

and in the winter, when Liquid Fuel consumption spikes and transporting Liquid Fuel into New

York City is more difficult.  Maintaining a steady supply of Liquid Fuel, especially in cold

weather, is essential for public safety and economic stability.

22.     As is set forth below, only the two deepwater terminals in New York City have

the capacity to receive, store, and distribute the quantities of Liquid Fuel products necessary to

meet New York City's Liquid Fuel demand.  Accordingly, large Liquid Fuel distributors, and

their access to Liquid Fuel Terminal Storage, are critical to the stability and reliability of the

New York City Liquid Fuel market.  Their ability to manage efficiently supply chains, mitigate

risks, and adapt to changing market conditions ensures that businesses, residences and public

services have the Liquid Fuel they need at a competitive price to operate smoothly.

### B. Liquid Fuel Products

23.     The Liquid Fuel market has two sets of products: heating oil and diesel fuel,

which includes biodiesel and renewable diesel.  As the name suggests, heating oil is used to

provide heat and hot water to buildings, including residential, commercial and industrial use

buildings.  Diesel fuel is used to power vehicles, especially those used to transport goods,

construction equipment and generators.

24.     Heating oil powers burners in furnaces, which in turn heat buildings and provide

hot water.  It is the primary heat source for many residential homes and commercial buildings in

New York City and a secondary heat source for many more.  Heating oil is essential for

maintaining habitable living and working conditions, especially in areas like New York City,

where the temperature drops below 32 degrees Fahrenheit for an average of 70 days every year. In the New York City market, heating oil includes two primary products: No. 4 heating oil and No. 2 heating oil.

25.    Diesel fuel is used to power many vehicles in New York City, including heavy transportation vehicles that cannot rely on gasoline powered engines. It also fuels construction equipment as well as primary and backup generators throughout New York City. Certain alternative Liquid Fuels can be blended with diesel fuel (biodiesel) or replace diesel fuel (renewable diesel) to reduce the carbon emissions from diesel burning engines and generators.

26.    Heating oil and diesel fuel are petroleum derived products, while renewable diesel and biodiesel are produced from organic compounds. All of these products are produced at locations outside New York City and all depend on the same methods of transportation and storage in order to be sold in the New York City Market. Heating oil and diesel fuel are generally transported by either ship or pipeline from distant locations in the United States or overseas to facilities in New Jersey where those fuels are stored and then subsequently transported into New York City, predominantly by barge, or in smaller quantities, by pipeline. Renewable diesel cannot be sent by pipeline and is generally shipped by barge directly to New York City from locations in Texas and Louisiana.

27.    There is limited pipeline access to transport Liquid Fuel into New York City, as the sole pipeline into New York City only services a single terminal located in Brooklyn, NY owned by United Metro Energy Corp. ("United Metro"). That terminal (the "United Metro Terminal") has significantly less storage capacity than the Buckeye or Sprague Terminals.

Further, that pipeline also supplies many non-Liquid Fuel products, and much of its capacity is devoted to servicing New York City's airports.

28.     In addition, tanker truck fleets would be inadequate to transport the quantity of Liquid Fuel required by the New York City market into the city.  Trucks transporting Liquid Fuel products are prohibited from using the tunnels into New York City are restricted to the upper levels of a few bridges into New York City, which are already burdened with traffic.  To rely on trucks to service the New York City market would require literally thousands of additional trucks to cross those already congested throughfares.  Moreover, trucks carrying Liquid Fuel are not able to travel on those bridges during certain cold weather events, when Liquid Fuel is often needed most.

29.     Accordingly, transporting Liquid Fuel in bulk for use in New York City is heavily dependent on barges, most of which can carry on average the equivalent of 400 truckloads of fuel and the largest of which can carry the equivalent of more than 675 truckloads of fuel.

### C.  Deepwater Barges and Terminals

30.      The barges that move Liquid Fuel into New York City can deliver either to a deepwater terminal or a shallow water terminal.  The key difference between the two is that a deepwater terminal can receive significantly larger barges, including those with the capacity to carry up to 100,000 barrels of Liquid Fuel per delivery.  By comparison, shallow water terminals can only accept the few shallow water barges left in New York City, which can only carry a small fraction of that amount.

31.     There are currently only two deepwater terminals in New York City: the Sprague Terminal at 939 East 138th Street, Bronx, New York, 10454, out of which Sprague operates; and the Buckeye Terminal at East 149th Street, Bronx, New York, 10455, out of which Approved currently operates, but which Sprague acquired in 2023.  The Sprague Terminal can store

907,500 barrels and has approximately 52% of the storage capacity for Liquid Fuel in New York City; the Buckeye Terminal can store 537,000 barrels and has approximately 31% of the Liquid Fuel storage capacity in New York City.  In 2024 Sprague informed Approved that it will not renew Approved's lease for the Buckeye Terminal when it ends in December 2025 and that it will close that terminal.  Together these two terminals account for approximately 83% of the Liquid Fuel Terminal Storage capacity in New York City.  Shallow water terminals make up the remaining approximately 17% of Liquid Fuel Terminal Storage capacity in New York City.

32.    In addition to providing much more storage capacity, deepwater terminals also allow for more reliable methods of transportation than shallow water terminals.  This is because inclement weather and shifting tides can sometimes make delivery to shallow water terminals physically impossible.  Difficulty accessing shallow water terminals, in combination with their limited storage capacity, leads to those terminals regularly running out of Liquid Fuel during the peak cold weather season.  Given a deepwater terminals' inherent advantages, their operators can supply the massive amounts of Liquid Fuel required by, in this instance, New York City, in a way that shallow water terminals cannot.

33.    In addition, the barriers to constructing a new deepwater terminal in New York City are extremely high.  To construct a deepwater terminal, various essential conditions must be met, including sufficient water depth, site considerations, facilities and technology.  Further, constructing new deepwater terminals in densely populated locations like New York City is constrained by numerous regulatory hurdles, licensing difficulties and sentiment in neighboring communities.

34.     Once transported and stored in New York City-based terminals, Liquid Fuel is, with minor exceptions, picked up by truck by retail distributors and delivered to large and small end-use customers in New York City.

**II.    Approved as a Disruptive Competitor**

35.     Approved was founded in 1932 to help transition New York City's energy from coal to cleaner-burning fuel oil.  From 1932 until 2013, Approved sold Liquid Fuel only as a retail distributor.  It acquired Liquid Fuel from larger distributors who had storage terminal capacity in New York City and delivered that fuel, including No. 2 heating oil, No. 4 heating oil and diesel fuel, by truck to end-use customers across the New York City Area, with the vast majority of its customers located in New York City.  Approved also provided then and provides now a variety of related services to customers, including maintenance and repair for heating systems, consulting, procurement and benchmarking services.

36.     In 2013, Approved entered the Liquid Fuel wholesale and large distribution business.  It started by, for the first time, leasing tank space from the Hess Corporation ("Hess") on Court Street in Brooklyn ("Court Street Terminal").  Pursuant to that agreement, Approved had the use of 40,000 barrels of comingled storage space.  With a lease in hand, Approved began purchasing Liquid Fuel directly from producers outside New York City and arranging for its transportation to New York City.  To that end it contracted with barge companies to bring Liquid Fuel shipments into New York City, set up a hedging account to protect against commodity price fluctuations, and secured a considerable line of credit to finance its new operations.  With these investments, Approved was able to bring Liquid Fuel economically by barge into New York City, to store it, and to supply its own retail customers, to supply larger commercial customers and to supply other Liquid Fuel retail distributors on a wholesale basis.  In 2014, Hess sold the

Court Street Terminal to Buckeye Partners ("Buckeye"), but Approved maintained its lease on that facility. Approved expanded its storage capacity at the Court Street Terminal over subsequent agreements with Buckeye. In 2015, Approved entered into a separate agreement with Buckeye for additional storage capacity at the Buckeye Terminal in the Bronx. In 2021, Buckeye sold the Court Street Terminal, and Approved therefore shifted all of its storage capacity to the Buckeye Terminal. This allowed Approved to continue leasing 327,000 barrels in storage capacity at the Buckeye Terminal alone.

37.    Through this expansion and building on its existing expertise and reputation in the market, Approved's operations grew from approximately 73.5 million gallons sold in 2013 to approximately 178.5 million gallons sold in 2022. Approved's entry into the wholesale and large-scale distribution market also allowed it to offer more competitive prices to its retail customers because it no longer had to purchase the fuel from other wholesalers.[1] This expansion would not have been possible if Approved had not had access to its own deepwater terminal tank storage. As of today, Approved supplies the majority of the Liquid Fuel it sells in New York City out of the Buckeye Terminal.

38.    With the expanded capacity afforded by the Buckeye Terminal, Approved also developed the ability to compete for much larger contracts, including those previously controlled by Sprague. For example, since 2014, Sprague has dominated the bidding for Department of Citywide Administrative Services ("DCAS") contracts to supply Liquid Fuel to New York City agencies. In order to provide the large volume required by the DCAS, and in order to bid at competitive prices, a distributor must have access to large quantities of Liquid Fuel at producer prices. In fact, DCAS requires bidders to certify that they have access to their own Liquid Fuel

---

[1] Approved maintained reciprocal purchasing agreements with other Liquid Fuel wholesalers, like United Metro, to help efficiently service customers in certain areas of New York City.

Terminal Storage capacity.  As the largest Liquid Fuel distributor in New York City with the largest storage capacity, Sprague dominated the DCAS contract bidding process prior to 2022.

39.    In addition, although the bidding process is designed to ensure the best price for New York City agencies, Sprague's dominant position in the Liquid Fuel Terminal Storage market allowed it to demand high prices and non-standard terms from DCAS.  For example, between 2017 and 2019 Sprague supplied biodiesel to New York City agencies under various contracts.  Pursuant to those contracts, Sprague was obligated to reimburse those agencies for the value of certain tax credits associated with biodiesel.  Sprague ignored this obligation and failed to reimburse the agencies more than $8.5 million for biodiesel tax credits.  The City of New York sued Sprague for the unpaid tax credits in May 2021, in an action titled *The City of New York v. Sprague Operating Resources*, LLC, 1:21-cv-02789 (E.D.N.Y.), and Sprague ultimately settled with the city two years later.

40.    Despite this dispute, DCAS had no choice but to turn to Sprague again for its next biodiesel contract in 2022.  But since New York City was now forcing Sprague to return tax credits owed under prior contracts, Sprague only offered biodiesel for this new contract at prices designed to produce extraordinary profit for Sprague.  DCAS, with no viable alternative, accepted those prices, and Sprague is under contract to deliver biodiesel to New York City agencies under inflated prices through 2027.

41.    However, fortunately for New York City agencies, as Approved's operations expanded, Approved was able to enter the bidding for DCAS contracts and to offer an alternative to Sprague.  Specifically, Approved got its opportunity in May 2022 when DCAS sought follow-up proposals from vendors for the procurement of Hydrogenation-Derived Renewable Diesel fuel ("HDRD"), which is an alternative environmentally friendly diesel fuel developed from fats

and vegetable oil.  DCAS's efforts to find a vendor for HDRD fuel had actually begun three

years earlier in 2019 when it sought competitive bids.  Only Sprague submitted a bid, but it

failed to bid on all items and crossed out multiple provisions in the proposed contract, including

DCAS's inspection requirements.  As a result, DCAS rejected the bid and did not award the

contract.  The following year DCAS again sought qualified vendors for the provision of HDRD

fuel for New York City agencies.  Again, Sprague submitted the only proposal, but after fourteen

months of unsuccessful negotiations, no ultimate agreement was reached.  DCAS released yet

another proposal for the procurement of HDRD fuel in May 2022.  This time, Approved

submitted its bid and for the first time Sprague had to compete with another Liquid Fuel

distributor for the contract.  More than a year later, in July 2023, Approved won the contract.

42.    This award of the HDRD contract threatened Sprague in multiple ways.  First, it

lost out on this lucrative contract.  Second, because HDRD is a higher quality replacement for

biodiesel, Approved's new HDRD sales to the city directly reduced the city's consumption of

biodiesel being supplied by Sprague under a prior contract.  Now Approved was not only selling

the city HDRD but also eating into Sprague's revenue from preexisting contracts.

### III.    Sprague Consolidates Its Control of New York City's Deepwater Terminals

43.    Even before Approved began competing with Sprague for DCAS bids, Sprague

attempted to consolidate its control over the sale of Liquid Fuel in New York City by trying to

buy Approved.  In the summer of 2021, Sprague approached Approved about potentially

acquiring the company, and thereby acquiring its least on the Buckeye Terminal.  However,

Sprague's attempt to acquire Approved ultimately proved unsuccessful.

44.    After Approved entered into negotiations with DCAS to bid for the City's HDRD

contract, but before Approved won that bid, Sprague escalated its response to this new threat

from Approved and doubled down on its efforts to establish monopoly power in the sale of

Liquid Fuel in New York City. Specifically, in November of 2022, Buckeye Partners announced that it was selling the Buckeye Terminal, the majority of which Approved was leasing. Sprague did not have any need for additional capacity because approximately 40% of the capacity at its own Sprague Terminal was unused. Nonetheless, if it bought the Buckeye Terminal, Sprague would then control approximately 83% of the Liquid Fuel Terminal Storage market in New York City. It would be able to drive Approved out of the large-scale Liquid Fuel distribution business, including large commercial contracts, DCAS contracts and wholesale supply to retail distributors.

45.    It was for this reason that Sprague submitted a $73.5 million bid for the Buckeye Terminal. This bid was more than $63 million larger, and more than seven times greater, than the $10 million Buckeye Partners had paid to Hess ten years earlier to purchase that terminal. Sprague's motivation for this overpayment—for capacity it did not need—is clear: it sought to secure monopoly power over the Liquid Fuel Terminal Storage market in New York City. Sprague's bid won.

46.    On information and belief, Sprague's bid substantially exceeded any other bid and the Buckeye Terminal's actual value. Sprague's bid only made economic sense because it would allow Sprague to force Approved, its key competitor, to exit the wholesale business and would eliminate Approved's capacity to sell to large customers, including the City of New York and other institutional buyers, thereby eliminating Sprague's primary competition for those customers.

47.    On November 22, 2022, after learning that Sprague's bid won, Approved sent a letter to Sprague through counsel demanding that Sprague cease and desist from proceeding with the Buckeye Terminal acquisition. In the letter, Approved explained that "Sprague owns the

16

largest deep-water terminal in New York City and the Buckeye Terminal is the next largest one.

If Sprague acquired the Buckeye Terminal, Sprague's capacity would be about three times larger

than all of the other capacity in New York City combined." The letter went on to state that "[t]he

effect of such an acquisition would be to substantially lessen competition in the wholesale

heating oil business and increase the price of oil to consumers."

48.     Sprague ignored the concerns raised by Approved and proceeded with the

transaction. Buckeye entered into an agreement with Defendant 149th LLC, a Sprague affiliate,

to transfer ownership of the Buckeye Terminal on March 30, 2023. By acquiring the Buckeye

Terminal, Sprague became the landlord of Approved, its chief competitor in New York City.

## IV.    Other Recent Acts in Furtherance of Sprague's Plan to Exclude Approved from Sales to Large Customers, Including the City of New York

49.     When Sprague purchased the Buckeye Terminal, Sprague took control over day-

to-day management of the terminal, as the former Buckeye employees who operate the terminal

began working for Sprague. Sprague then began interfering with Approved's operations out of

that terminal in an attempt to harm Approved's ability to compete with Sprague, further

evidencing its intent to restrain competition illegally.

### A. Tank 9011 Inspection

50.     Before Approved even began deliveries under the DCAS HDRD contract it had

won, Sprague took steps to hinder Approved's ability to deliver the product. In preparation for

storing renewable HDRD diesel at the Buckeye Terminal, Approved decided to repurpose Tank

9011 at the terminal. On June 21, 2023, Sprague informed Approved that it required written

confirmation from Buckeye Partners that Tank 9011 could be repurposed. Sprague provided no

explanation as to why Buckeye Partners needed to weigh in on this decision. After Approved

contacted Buckeye, Buckeye emailed Sprague the next day confirming that the tank could be repurposed to store renewable diesel.

51.     Then, over a month later, on July 28, 2023, Sprague claimed for the first time that Approved would also need an API 653 inspection—a periodic assessment to detect any structural problems—of Tank 9011 before it could store renewable diesel.  Tank inspections like this are time-consuming and expensive.  Having an API 653 inspection conducted at that time likely would have prevented Approved from beginning renewable diesel deliveries to New York City agencies the following month as required under the HDRD contract it had won.  Such a failure would have forced New York City agencies to turn back to Sprague for supply of either renewable diesel or replacement biodiesel blended fuel.

52.     In addition, the API inspection Sprague demanded was entirely unnecessary, since the Liquid Fuel previously stored in Tank 9011 required the same specifications as the renewable diesel product that Approved now wanted to store in the tank.  Approved raised this discrepancy with Sprague on July 31, 2023.  Sprague agreed to contact the New York Department of Environmental Conservation ("DEC") to check if a tank inspection was necessary.  Sprague claimed it would receive a response within two days, but then did not respond for more than two weeks.

53.     On August 15, 2023, with time running out to prepare Tank 9011, Approved again reached out to Sprague to check whether an API 653 inspection was required.  After these delays, Sprague finally relented and informed Approved that DEC did not require an inspection to convert Tank 9011.

   B.  *Blocking Deliveries*

54.     Unable to stop Approved from fulfilling the contract through unnecessary tank inspections, Sprague turned to other methods.  Specifically, Sprague took advantage of its

control of the Buckeye Terminal to make the false claim that it had not been supplied the correct insurance documentation for the trucks being used to pick up fuel at the terminal for delivery to New York City agencies.

55.    In truth, Approved had provided Sprague with a list of city owned trucks that would be delivering renewable diesel under the contract, including for the New York City Housing Authority.  Despite the fact that the New York City Housing Authority had regularly picked up deliveries from the Sprague Terminal, and that the vehicles were in fact insured, Sprague still claimed it did not have relevant insurance documents for the trucks.

56.    On August 24 and 28, 2023, Sprague told Approved that it also needed the insurance information for four other New York City agencies.  Approved responded immediately by explaining that the vehicles for the New York City agencies were all insured and that Sprague should already have that information on file, since those city agency trucks regularly picked up deliveries from the Sprague Terminal.

57.    To resolve the issue, Approved requested that DCAS resend confirmation to Sprague that all the New York City agency trucks were insured as of August 30, 2023.  Even though DCAS sent this confirmation, Approved learned on September 1, 2023—the first day that deliveries began under the contract—that New York City agency vehicles were being turned away from the Buckeye Terminal because Sprague claimed not to have adequate records for those vehicles.  Sprague continued to turn away certain vehicles, despite the fact that those same trucks were allowed to pick up from the Sprague Terminal during the following week.

### C. Interference with Independent Truckers

58.    At the same time that Sprague was interfering with attempts by city trucks to pick up HDRD fuel, Sprague also interfered with Approved's ability to retain independent truckers to

19

deliver under the contract.  On August 23, 2023, Approved approached Star Energy to see if it would be willing to deliver for Approved under the HDRD contract.  Star Energy was the obvious choice for this role, because it had previously delivered biodiesel to New York City agencies under Sprague's contract with DCAS, and it had a good working relationship with many of those agencies.

59.    Negotiations between Approved and Star Energy continued until August 25, 2023, when Star Energy informed Approved that Sprague had threatened to stop doing any work with Star Energy if it agreed to deliver under the HDRD contract for Approved.  Star Energy also revealed that Sprague falsely claimed Approved did not have a clean tank available to store the renewable diesel, even though cleaning on Tank 9011 had been completed weeks earlier.

60.    Star Energy declined ultimately to deliver renewable diesel for Approved in the face of Sprague's threats.  Sprague likewise threatened to halt all business with Rags Trucking, MTM Transportation and JAG Transportation if they agreed to deliver renewable diesel for Approved.  While Sprague's threats dissuaded Rags Trucking and MTM Transportation from agreeing to deliver for Approved, JAG Transportation agreed to take on the deliveries despite Sprague's threats.

61.    Although Approved eventually resolved the inspection, tank cleaning, truck insurance and independent truck contracting issues, Sprague's intention was clear: it was trying to prevent Approved from delivering under the contract in its initial stages.  This is not mere conjecture, as Sprague also told purchasers of Liquid Fuel, including individuals at DCAS, that Approved would not be able to deliver under the contract, all in an attempt to force DCAS to revert to Sprague's bid instead.

V.    **Sprague Refuses to Renew Approved's Lease at the Buckeye Terminal**

62.    In 2024, Sprague took the next significant step in its plan to eliminate Approved as a large distributor of Liquid Fuel and its primary competitor in New York City.  In February 2024, since Approved understood that it could not continue to supply wholesale and large institutional customers, including the City of New York, without access to the Buckeye Terminal, Approved contacted Sprague, which now owned that terminal, seeking to extend its lease beyond the current expiration date of December 31, 2025.

63.    Two weeks later, on March 8, 2024, Sprague informed Approved in writing that it would not extend its lease and that it was converting the Buckeye Terminal "to alternative uses." As consolation, Sprague offered to sell Approved "distillate products" based on an increase over what is known as the Argus Media ("Argus") price[2] "at the rack" at the Sprague terminal "on terms consistent with other similar-sized accounts."  In essence, Sprague would control the price above Argus at which Approved would buy, preventing Approved from competing on price for large commercial customers and retail distributors, as well as limiting its ability to sell profitably to smaller retail customers.  This would force Approved out of the wholesale business and eliminate Approved's ability to serve large institutional customers, including New York City agencies.

64.    On March 12, 2024, Approved informed Sprague that the proposed offer to sell based on some undefined increase over the Argus formula was not an adequate substitute for Approved's access to Liquid Fuel Terminal Storage.  Approved explained that buying off of an Argus formula is not a substitute for Approved's ability to buy Liquid Fuel directly from refiners and producers of Liquid Fuel products.  Further, Sprague's proposal provided no means for

---

[2] Argus is a commodities and analytics company that publishes a price benchmark for refined oil products.

Approved to maintain the storage capacity necessary to maintain its renewable diesel contract with DCAS, to compete for future DCAS contracts, or to bid for other large institutional Liquid Fuel contracts.  In addition, there is no available Argus rate for renewable diesel in New York City, and therefore Approved would simply lose access to that product, leaving Sprague as the only renewable diesel supplier in New York City, including to city agencies which are required to use renewable fuel.  Approved asked if in the alternative it could lease tanks at the Sprague Terminal with capacity and specifications similar to those it had at the Buckeye Terminal. Sprague never responded to this request or any subsequent requests.

65.     With Approved's lease of the Buckeye Terminal set to end in less than 12 months, Sprague will have monopoly power over the Liquid Fuel Terminal Storage market in New York City, as it will control approximately 83% of the storage capacity.  The four remaining terminals, all of which are smaller, shallow water terminals, will not be able to cover the gap left in the market after the Buckeye Terminals closes.  Much of New York City will only be serviced out of the Sprague Terminal, giving Sprague the ability to raise prices artificially.  Further, the current third largest Liquid Fuel Terminal Storage supplier in the New York City market, United Metro, cannot meaningfully compete with Sprague for many DCAS contracts because of its limited storage capacity.  As a result, Sprague will again become New York City agencies' primary Liquid Fuel supplier after December 31, 2025.

66.     By acquiring the Buckeye Terminal—the only remaining deepwater terminal not already owned by Sprague—Sprague acquired control over the vast majority of storage capacity for Liquid Fuel—No. 2 heating oil, No. 4 heating oil, diesel fuel, biodiesel, and renewable diesel—in New York City.  Acquisitions resulting in a post-acquisition market share of greater than 30% in a highly concentrated market are presumed likely to lessen substantially competition

in violation of Section 7 of the Clayton Act.  Sprague's acquisition of the Buckeye Terminal far exceeds that presumption threshold.

## VI.    The 2023 Acquisition and Its Anticompetitive Effects

### A.  The Relevant Product Market

67.     The relevant product market is storage facilities for Liquid Fuel, referred to herein as Liquid Fuel Terminal Storage, which certain firms either lease to other distributors or own and use for their own distribution business.  Terminal storage refers to providing facilities used to store Liquid Fuel at a terminal, dock operations and other related services.  Prior to Sprague's acquisition of the Buckeye Terminal, both Buckeye and Sprague offered Liquid Fuel Terminal Storage in New York City.  The other suppliers of Liquid Fuel Terminal Storage in New York City are United Metro, Bayside Fuel Oil Depot Corporation ("Bayside") and Skaggs-Walsh.

68.     Some suppliers of terminal storage, like Sprague and United Metro, are also large Liquid Fuel distributors, *i.e.*, they are vertically integrated firms that lease terminal access and storage to other companies and also sell Liquid Fuel to customers.  Other suppliers of terminal access and storage, like Buckeye prior to the sale of its terminal to Sprague, only lease terminal access and storage and do not participate in the sale of Liquid Fuel to customers.  Bayside owns Terminal Storage which it uses to supply Liquid Fuel on a wholesale basis to other retail distributors and it also sells Liquid Fuel on retail basis to its own residential and commercial customers.  Skaggs-Walsh owns Terminal Storage that it uses to store Liquid Fuel that it sells only on retail basis to its own residential and commercial consumers.  Approved does not own any Terminal Storage and only leases it from others, formerly from Buckeye and now from Sprague.

69.     Customers in the Liquid Fuel Terminal Storage market are large Liquid Fuel distributors, such as Approved.  Large Liquid Fuel distributors are firms that buy Liquid Fuel

directly from refiners, arrange to transport that fuel to New York City, lease or own Liquid Fuel Terminal Storage, and: (a) sell Liquid Fuel directly to large institutional customers such as the agencies of the City of New York or other commercial entities that consume Fuel Oil; (b) sell Liquid Fuel on a wholesale basis to retail distributors that then sell that Liquid Fuel on to consumers, including residential or commercial customers; and (c) sell Liquid Fuel directly to retail residential and commercial customers.

### B. The Relevant Geographic Market

70.     The relevant geographic market is New York City.

71.     Liquid Fuel Terminal Storage suppliers provide large Liquid Fuel distributors with the access points necessary to store and distribute Liquid Fuel to New York City customers through a supply chain that is unique to New York City.  Large Liquid Fuel distributors in New York City require access to terminals located in New York City because they need access to large quantities of Liquid Fuel, low prices that come with buying in bulk, and the ability to respond quickly and on short notice to spikes in demand, including during extreme weather emergencies.

72.     Large Liquid Fuel distributors in New York City generate the vast majority of their business from customers located within New York City.  Large Liquid Fuel distributors deliver from terminals located in New York City because it is more cost-effective and practical to move Liquid Fuel from those terminals.  Despite the proximity of the New Jersey terminals to New York City, there are four key restrictions that prevent the delivery of Liquid Fuel to wholesale and retail customers in New York City from out of state.

73.     *First*, New York State and City restrictions prevent transporting Liquid Fuel through many of the major arteries into New York City, including tunnels and the lower levels of bridges into the area.  As a consequence, Liquid Fuel shipments entering New York City from

New Jersey are restricted to the upper levels of the few bridges into New York City, which can be closed down to all traffic during inclement weather due to ice, wind or accidents, when demand for Liquid Fuel is highest.

74.     *Second*, even when these limited avenues into New York City are available, traffic congestion impacts the ability to transport Liquid Fuel by truck from outside the market quickly and efficiently.  For example, a truck transporting Liquid Fuel from the Buckeye Terminal to Lower Manhattan can make the trip in twenty-six minutes.  Making a similar delivery from the Pennsauken, NJ Wholesale Terminal in New Jersey is lengthy in light traffic and much longer in heavy traffic.

75.     *Third*, it would take several hundred such trucks making regular deliveries to match a single barge, compounding the traffic issue and increasing delays.  Use of trucks to transport Liquid Fuel into New York City from New Jersey is not practical, lacks economic sense even in the best of conditions and is potentially dangerous when servicing heating needs during cold weather.

76.     *Fourth*, New York and New Jersey impose different regulations on heating oil that preclude rerouting certain supply intended for markets in New Jersey to New York City. For example, under New York City Local Law 43-2010, No. 4 Heating Oil can only contain 1,500 parts per million ("PPM") sulfur.  By comparison, No. 4 Heating oil in New Jersey may contain up to 2,500 PPM sulfur.  As a result, much of the heating oil stored in New Jersey cannot be legally sold into New York City unless it is specifically intended for the New York City market.

77.     As a result, a small but significant non-transitory increase in the price of Liquid Fuel Terminal Storage in the New York City market would not cause a significant number of customers to purchase Liquid Fuel Terminal Storage outside of New York City.

### C. Market Participants and Market Structure

78.     After Sprague's 2023 acquisition of the Buckeye Terminal, there are only four competitors in the Liquid Fuel Terminal Storage market in New York City:  Sprague, United Metro, Bayside and Skaggs-Walsh.

79.     Those Liquid Fuel Terminal Storage providers, and their approximate shares of total New York City's Liquid Fuel Terminal Storage, are as follows:  Sprague's share has increased from approximately 52% pre-acquisition to approximately 83% post-acquisition, United Metro has approximately 11%, Bayside has approximately 5%, and Skaggs-Walsh has approximately 1%.  Using the well-accepted Herfindahl-Hirschman Index ("HHI") for calculating market concentration, the pre-acquisition HHI is approximately 3,829.[3]  The increase in concentration from Sprague's acquisition of the Buckeye Terminal is approximately 3,221.  The post-acquisition HHI is approximately 7,050.[4]  Under the Department of Justice and Federal Trade Commission Merger Guidelines, mergers resulting in a post-merger HHI above 1,800 with an increase in the HHI greater than 100 are presumptively unlawful.  Under the same Merger Guidelines, a post-acquisition market share of greater than 30% with a change in the HHI greater than 100 is also presumptively unlawful.  In this case, Sprague's post-acquisition market share of Liquid Fuel Terminal Storage capacity is approximately 83%, almost triple that threshold.

---

[3] The HHI is the sum of the squares of the market shares of the market participants.  The HHI is small when there are many small firms and large when there are a few firms.  *See* Unites States Department of Justice and Federal Trade Commission Merger Guidelines (2023) at section 2.1.
[4] HHIs are rounded to the nearest integer, but are calculated based on un-rounded market shares.

Moreover, the post-acquisition HHI and change in concentration is orders of magnitude above the structural presumption level.

80.    United Metro, like Approved and Sprague, sells heating oil, diesel and biodiesel to retail and wholesale customers in New York City, though it does not sell any renewable diesel products.  United Metro operates the pipelined-supplied United Metro Terminal that also has shallow water access at 500 Kingsland Avenue, Brooklyn, New York, 11222.

81.    The United Metro Terminal differs significantly from the Buckeye and Sprague Terminals.  First and foremost, the United Metro Terminal is a pipeline-supplied terminal, not a deepwater terminal.  The same pipeline supplies fuel to New York City's airports, which take priority over the United Metro Terminal.  As a result, the pipeline cannot reliably keep the United Metro Terminal supplied during peak winter months.  To compensate for this uneven supply, the United Metro Terminal can also accommodate shallow water barges, but those barges can only carry a fraction of the Liquid Fuel that deepwater barges can carry.  Those barges must also pass under a drawbridge, which is sometimes inoperable in colder weather, to reach the United Metro Terminal.  Moreover, the Buckeye and Sprague Terminals are much larger than the United Metro Terminal.  With a capacity of approximately 200,000 barrels, the United Metro Terminal is much less than half the size of the Buckeye Terminal at 537,000 barrels and less than a quarter of the size of the Sprague Terminal at 907,500.  Given these supply and capacity constraints, the United Metro Terminal from time-to-time runs out of Liquid Fuel in the winter.

82.    In light of the United Metro Terminal's inherent limitations, it cannot replace the lost storage capacity of the Buckeye Terminal should Sprague succeed in closing it.  The United Metro Terminal's inability to accommodate deepwater vessels, coupled with its lesser barrel capacity, renders United Metro capable of holding only approximately 11% of the market's

storage capacity.  United Metro's smaller storage capacity also limits its ability to compete consistently with Sprague on bids for contracts with New York City agencies.

83.    Following Sprague's 2023 acquisition and the expiration of Approved's lease at the Buckeye Terminal in December 2025, there will only be two suppliers controlling more than 94% of the Liquid Fuel Terminal Storage market in New York City.  Those suppliers, and their approximate shares of total New York City wholesale market capacity of Liquid Fuel, will be Sprague with approximately 83% and United Metro with approximately 11%.

84.    In addition to the above-described deepwater and pipeline-supplied terminals, there are three other shallow water terminals located in New York City: the Grand Street and Smith Street terminals in Brooklyn operated by Bayside, which sells to both retail and wholesale customers, and the College Point terminal in Queens operated by Skaggs-Walsh, which only sells to retail customers.  Collectively, these smaller terminals can only store approximately 95,000 barrels of Liquid Fuel, less than a fifth of the total storage capacity of just the Buckeye Terminal, or about 6% of the market capacity.

85.    With its acquisition of the Buckeye Terminal, Sprague obtained effective monopoly power over Liquid Fuel Terminal Storage in New York City.  In addition, because Sprague is vertically integrated, its acquisition of the Buckeye Terminal also creates a near-monopoly for the sale of Liquid Fuel on a wholesale basis to retail distributors because Approved will no longer have access to Liquid Fuel Terminal Storage and therefore will no longer be able to sell Liquid Fuel on a wholesale basis.

D.  *Barriers to Entry and Expansion*

86.    The barriers to timely, likely and sufficient entry to replace the Buckeye Terminal in the New York City market for Liquid Fuel Terminal Storage are formidable.  Construction of a new deepwater terminal that can service New York City will take many years to complete.

28

*First*, there are few, if any, available sites in New York City for construction of a deepwater terminal. A deepwater terminal requires sufficient water depth for the terminal and related facilities. *Second*, obtaining the required permits and approvals to construct a new deepwater terminal in densely populated locations like New York City would take many years and may not be possible. *Third*, the construction time after obtaining all the required permits and approvals itself would take substantial additional time. In addition, capacity expansion by the smaller remaining terminal providers to replace the lost capacity from the closure of the Buckeye terminal will also not be timely, likely or sufficient. Those smaller shallow water terminals are also constrained in their size by similar permitting and space limitations, as well as the smaller size of barges that can supply them. As a result, new entry or expansion would not be timely, likely or sufficient to defeat a post-acquisition price increase. Thus, large Liquid Fuel distributors will not have alternative options for Liquid Fuel Terminal Storage to switch to in response to a small but significant non-transitory increase in price.

87.     There is also no reason to believe that Sprague would be willing voluntarily to lease substantial Liquid Fuel Terminal Storage to a new entrant and to do so at a price that would otherwise be available in a fair and competitive market. Indeed, Sprague has already refused to lease such space to Approved, either at its Sprague Terminal or at the Buckeye Terminal. In addition, Sprague has announced its intention to close the Buckeye Terminal, thereby making it unavailable to any new entrant and leaving its Sprague Terminal as the only remaining deepwater terminal in New York City.

E.  *Anticompetitive Effects*

i.  *Effects on Liquid Fuel Distributors*

88.    The effect of the 2023 acquisition has been and will continue to be to substantially lessen competition, or to tend to create a monopoly, in the New York City Liquid Fuel Terminal Storage market.

89.    Through its acquisition of the Buckeye Terminal, Sprague is effectively capitalizing on its increased market power in Liquid Fuel Terminal Storage to foreclose Approved's access to the only deepwater terminals capable of providing a competitively priced Liquid Fuel to New York City.  Sprague would not enjoy this market power but for the 2023 acquisition.

90.    Approved's own experience bears out that Liquid Fuel customers do not view Liquid Fuel distributors without access to substantial terminal storage in New York City as meaningful substitutes for those with that access.  Since Sprague announced it will not extend Approved's lease and will close the Buckeye Terminal, Approved has been stymied in its negotiations with longstanding customers, because it cannot enter into any contracts extending beyond December 31, 2025.  In addition, Approved cannot submit competitive bids for any new DCAS contracts, including the City of New York's general heating contract that will likely come up for bid in early 2025, because bidding on those contracts requires access to storage capacity for multiple years.

91.    Sprague's unlawful acquisition of the Buckeye Terminal has had or will have the effect of foreclosing access to deepwater terminals by large Liquid Fuel distributors in the New York City market, which will in turn further restrict competition in the New York City Liquid Fuel Terminal Storage market, thereby harming all Liquid Fuel purchasers.

*ii.  Effects on Consumers of Liquid Fuel*

92.      There are no viable short-term alternatives to Liquid Fuel products, which rely on Liquid Fuel Terminal Storage.  As a result, Sprague's monopoly power over the Liquid Fuel Terminal Storage market will have significant adverse effects on all Liquid Fuel consumers.

*1.  No. 2 and No. 4 Heating Oil*

93.      No. 2 and No. 4 heating oil are not reasonably interchangeable with other energy products.  Both natural gas and electric heating require completely new systems to be installed if a building is to be converted away from burning heating oil.  This is an expensive and time-consuming process that bars consumers from easily switching from heating oil to natural gas or electric heating when faced with increased heating oil prices.

94.      While numerous buildings in New York City rely on natural gas or electricity to generate heat, there are still tens of thousands of buildings that depend on heating oil for a variety of reasons.  In addition to the time and expense involved in converting equipment, switching to natural gas presents additional challenges.  For example, natural gas can only be delivered to buildings through a pipeline, while heating oil is delivered by truck.  But the natural gas pipeline in New York City does not have sufficient capacity to deliver the amount of natural gas needed to power heating furnaces during the coldest weather.  As a result, many buildings with natural gas furnaces also have the alternative ability to burn oil in the coldest weather.  Indeed, New York State requires buildings with that capability to switch over to oil burning when the temperature drops below a certain level, often set at 23 degrees Fahrenheit.  In addition, any damage or disruption to that pipeline can impact the supply of natural gas to the consumer.  For example, freezing temperatures can cause water within the pipeline to freeze and create significant blockages.

95.     Some New York City buildings employ electrified heating elements instead. There are two forms of electric heating: electric resistance heaters and electric heat pumps. Electric resistance heaters—including electric furnaces, electric baseboard heaters, electric wall heaters, and electric space heaters—convert electricity into heat.  By comparison, electric heat pumps do not generate heat.  Rather, they collect and concentrate heat from the air or ground outside and transfer it to the inside of a home or building.

96.     Both types of electrified heating have material drawbacks.  For electric resistance heaters, the conversion of fuel to electricity to heat is costly.  Although electric resistance heaters convert all incoming electricity into heat, they must derive that electricity from coal, gas or oil generators.  Those generators convert only about 30% of the fuel's energy into electricity.  Due to these generation and transmission losses, electric resistance heating is generally more expensive than burning heating oil.

97.     As for electric heat pumps, such systems struggle in the coldest temperatures when stable heating is most important.  When temperatures fall below freezing, electric heat pumps cannot capture enough outdoor heat energy to adequately heat indoor space.  To accommodate for this deficiency, some consumers install a dual fuel system that uses an electric heat pump in milder weather, and an oil burner furnace in below-freezing temperatures.  In addition to the above-described cost and efficacy concerns, all electric heating methods are also vulnerable to power outages, whereas burning heat oil is not.

98.     Given these issues with natural gas and electric heating, consumers of heating oil do not view natural gas and electricity as close substitutes for heating oil.  In addition, conversion of a building from an oil furnace either to electric heat or natural gas is time consuming and expensive.  Accordingly, a small but significant non-transitory increase in the

price of No. 2 and No. 4 heating oil would not cause a significant number of purchasers of these products to substitute to other energy sources including natural gas and electricity.

### 2. Diesel Fuel

99.     As with heating oil, there are limited alternatives to using diesel fuel to power transportation vehicles, construction equipment and generators.  Natural gas is generally not used to power vehicle internal combustion engines, and gasoline cannot be used as a viable alternative because gasoline engines generally do not provide sufficient torque to replace diesel engines in heavier transportation vehicles or to power construction equipment.  As a result, the primary alternative to diesel vehicles is electric vehicles.  However, many heavy vehicles in New York City continue to rely on diesel fuel given the challenges posed by electrifying a fleet of those vehicles.

100.    Two factors make transitioning from diesel to electric vehicles on a widespread basis impractical on a cost basis alone.  *First*, purchase prices for electric vehicles are significantly higher than those for diesel vehicles.  *Second*, electric vehicles' lifespans are limited relative to diesel vehicles.  Manufactures tend to guarantee electric vehicle batteries for eight years or 100,000 miles, whereas a diesel engine's average lifespan, depending on care and maintenance, is around 500,000 to 800,000 miles.  Further, certain diesel fueled vehicles, such as ferries, may not even have practical electric alternative available.  As a result, there are far more diesel fueled vehicles, including garbage trucks, transportation trucks and construction equipment, in New York City than electric alternatives, and the transition from the former to the latter will be slow at best.

101.    Given these issues with natural gas, gasoline and electricity, consumers of diesel fuel do not view natural gas, gasoline and electricity as substitutes for diesel fuel.  A small but significant non-transitory increase in the price of diesel fuel would not cause a significant

number of purchasers of diesel fuel to substitute to other energy sources like natural gas and electricity for powering vehicles.

**VII.    The Defendants' Anticompetitive Actions Caused Approved to Suffer Antitrust Injury**

102.    Defendants' acquisition of the Buckeye Terminal has harmed Approved for the same reason it has harmed competition generally:  It has foreclosed access to the facilities necessary to compete in the New York City market for Liquid Fuel.  Sprague's acquisition and closure of the Buckeye Terminal has harmed Approved by stripping it entirely of its capacity to distribute fuel on a wholesale basis to Liquid Fuel retail distributors as well as to large customers in New York City, including the City of New York and other commercial end-users.

103.    In fact, several key Liquid Fuel customers have already moved their business from Approved to Sprague in anticipation of Sprague forcing Approved out of the market.  For example, in September of 2023, United Metro canceled its reciprocal purchasing agreement with Approved.  That agreement allowed United Metro to purchase heating oil from the Buckeye Terminal to service United Metro customers in the Bronx.  United Metro has now switched to a similar arrangement with the Sprague Terminal in the Bronx in anticipation of Approved losing access to the Buckeye Terminal.  In addition, numerous retail distributors that previously purchased Fuel Oil from Approved on a wholesale basis have refused to entertain bids from Approved because it soon will not have storage capacity.  This trend will only accelerate in the coming months as the closure of the Buckeye Terminal in December 2025 approaches.

104.    Furthermore, Sprague's anticompetitive conduct will harm consumers, who will be forced to bear any artificially inflated costs Sprague imposes with the monopoly power it has acquired through its purchase and ultimate closure of the Buckeye Terminal.  By precluding competition from Approved, Defendants can charge supracompetitive prices for Liquid Fuel.

Because there is limited competition in the New York City Liquid Fuel Terminal Storage market due to geographic constraints, there are few checks on the high prices that Defendants charge.

106.   Defendants' anticompetitive exclusion of Approved was intended to, and has had the effect of, suppressing competition in the New York City market for Liquid Fuel.

106.   More fundamentally, the direct injury here is not limited to Approved. Defendants' illegal, exclusionary and anticompetitive conduct harms all competing large Liquid Fuel distributors, potential entrants and, ultimately, consumers.  Specifically, Defendants' scheme to deny Approved and other large Liquid Fuel distributors access to terminal facilities prevents those companies from:

> a.   Entering the market for wholesale Liquid Fuel in New York City, thereby limiting output and competition in that market;
>
> b.    Entering the market for Liquid Fuel sales to large commercial customers in New York City, thereby limiting output and competition in the market;
>
> c.   Realizing increased economies of scale which lead to lower consumer prices, including in the smaller end-user retail market; and
>
> d.   Securing supply guarantee needed to bid competitively for supply contracts from large customers, including the agencies of the City of New York.

107.   The foregoing acts have harmed Approved, consumers and competition by limiting competition for Liquid Fuel in the New York City market, limiting consumer choice, raising transaction costs to both wholesalers and retail distributors of Liquid Fuel, and artificially maintaining prices for Liquid Fuel above what would exist but for the anticompetitive conduct alleged herein.

108.    The ultimate victims of Defendants' illegal scheme are end users of Liquid Fuel, including residents of New York City, commercial businesses, hospitals, housing complexes, schools and New York City agencies.

109.    Having secured approximately 83% of the Liquid Fuel Terminal Storage market capacity, coupled with United Metro's limited ability to expand its storage capacity to compete effectively with Sprague, Sprague has nearly unchecked market power to inflate prices artificially.  Without a viable alternative and given the clear need for Liquid Fuel, consumers will be forced to pay whatever price Sprague deems appropriate.

## CLAIMS FOR RELIEF

## COUNT I

**Unlawful Acquisition Violating Section 7 of the Clayton Act, 15 U.S.C. § 18**

110.    Approved realleges and incorporates by reference the allegations in each of the preceding paragraphs as though fully set forth herein.

111.    Defendants are corporations engaged in interstate trade and commerce.

112.    Defendants, Buckeye, United Metro, Bayside and Skaggs-Walsh were all competitors in the New York City market for Liquid Fuel Terminal Storage.

113.    On March 31, 2023, Defendants acquired the Buckeye Terminal in order to deny its competitors in the sale of Liquid Fuel, including Approved, access to the only deepwater terminal in New York City that Defendants did not already own.

114.    On March 8, 2024, Sprague announced its decision (i) not to renew Approved's lease of the Buckeye Terminal and (ii) to convert the terminal to alternative use.

115.    Through its acquisition of the Buckeye Terminal, Sprague achieved substantial market power in the Liquid Fuel Terminal Storage market in New York City.  Defendants

currently own the only two deepwater terminals and approximately 83% of the Liquid Fuel Terminal Storage Capacity in New York City.

116.    The Liquid Fuel Terminal Storage market is highly concentrated and barriers to entry and expansion are high.

117.    This acquisition is likely to substantially lessen competition in the market for Liquid Fuel Terminal Storage in New York City.

118.    Through its acquisition of the Buckeye Terminal and termination of Approved's lease, Sprague has deprived Approved of the ability to continue to operate as a large Liquid Fuel distributor and wholesaler.

119.    Among other things, Defendants' acquisition of the Buckeye Terminal will substantially increase Defendants' ability to artificially raise prices on fuel at the expense of all Liquid Fuel customers in New York City.

120.    Defendants cannot show that any cognizable efficiencies resulting from the acquisition of the Buckeye Terminal are of a character and magnitude such that acquisition is not likely to be anticompetitive.

121.    As a result of the acquisition, Approved has suffered and will continue to suffer injury and damages flowing from Defendants' antitrust violations.

## COUNT II

**Monopolization of the New York City Liquid Fuel Terminal Storage Market in Violation of Sherman Act § 2**

122.    Approved realleges and incorporates by reference the allegations in each of the preceding paragraphs as though fully set forth herein.

123. By controlling the only two deepwater terminals in New York City, Defendants have illegally obtained monopoly power in the New York City market for Liquid Fuel Terminal Storage.

124. Defendants willfully and successfully acquired their monopoly power in the market for Liquid Fuel Terminal Storage with the specific intent of monopolizing that market.

125. Defendants engaged in exclusionary conduct by acquiring the Buckeye Terminal and blocking Approved's ability to fulfill its contractual duties with its customers.

126. As a result of the exclusionary conduct set forth above, Sprague has obtained monopoly power in the New York City market for Liquid Fuel Terminal Storage by acquiring approximately 83% of the storage capacity in that market.

127. The conduct described above constitutes a monopolization of the New York City market for Liquid Fuel Terminal Storage in violation of Section 2 of the Sherman Act.

128. As a result of Sprague's unlawful conduct, Plaintiff Approved has suffered injury to its business and property.

129. The harm Approved is suffering is antitrust injury because it flows from Sprague's unlawful monopoly power.

130. Defendants cannot show that any cognizable efficiencies resulting from the acquisition of the Buckeye Terminal are of a character and magnitude such that acquisition is not likely to be anticompetitive.

131. As a result of the acquisition, Approved has suffered and will continue to suffer injury and damages flowing from Defendants' antitrust violations.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff prays as follows:

132.    That Defendants' conduct specified in this Complaint be declared by the Court to violate Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 2 of the Sherman Act, 15 U.S.C. § 2;

133.    That the Court order such remedial actions and/or divestitures by Defendants as may be required to unwind the unlawful acquisition, restore competition, and prevent the recurrence of antitrust violations in the future;

134.    That the Court order Defendants to extend Approved's current lease of the Buckeye Terminal with the same terms and conditions until the completion of any ordered divestitures;

135.    That the Court issue further equitable relief in the form of a permanent injunction prohibiting Defendants' acquisition of the Buckeye Terminal or prohibiting Defendants' elimination of the Buckeye Terminal's ability to function as a deepwater Liquid Fuel terminal, ongoing and future exclusionary conduct, and other unreasonable vertical restraints by Defendants;

136.    That judgment be entered for Plaintiff against Defendants for three times the amount of damages sustained by Plaintiff as allowed by law, together with the costs of this action, including reasonable attorneys' fees and expenses pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26;

137.    That Plaintiff be awarded pre-judgment and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law; and

138.    That Plaintiff receive such other, further or different relief as the case may require and the Court deems just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

139.    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Approved demands a jury trial of all issues so triable.

Dated: New York, New York        DECHERT LLP
      January 15, 2025


By: */s/ Jonathan R. Streeter*
    Jonathan R. Streeter
    Jonathan.Streeter@dechert.com
    Edward A. McDonald
    Edward.McDonald@dechert.com
    Nicholas Gersh (admission to EDNY pending)
    Nicholas.Gersh@dechert.com
    Three Bryant Park
    1095 Avenue of the Americas
    New York, NY  10036-6797
    Telephone:  +1 212 698 3672
    Facsimile:  +1 212 698 3599

    James A. Fishkin (*pro hac vice* forthcoming)
    James.Fishkin@dechert.com
    Erica Fruiterman (*pro hac vice* forthcoming)
    Erica.Fruiterman@dechert.com
    1900 K Street, NW
    Washington, DC 20006
    Telephone: +1 202 261 3421
    Facsimile: +1 202 261 3333

    *Attorneys for Plaintiff*